**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**ANDREW WHEELER**                                                                                    **PLAINTIFF**

**VERSUS**                                                        **CIVIL ACTION NO. 2:09cv008KS-MTP**

**ILLINOIS CENTRAL RAILROAD COMPANY**                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion To Exclude Testimony of Plaintiff's Expert, Raymond A. Duffany [Doc. # 80] (August 16, 2010). The Court, having reviewed the motion, the responses, the pleadings, and exhibits on file and being otherwise fully advised in the premises, finds that the motion should be **denied.** The Court specifically finds as follows:

**I. FACTS**

Andrew Wheeler alleges that he was injured while operating a main line railroad switch at North Old Augusta Road Junction near Hattiesburg, Mississippi (the "NOAR switch"), and seeks recovery against his prior employer, Illinois Central Railroad Company ("ICRR") under the Federal Employers Liability Act ("FELA"). 45 U.S.C. §51 *et seq.* He alleges that the NOAR switch was defective and negligently maintained and inspected under the requirements set forth in 49 C.F.R. § 213.235 and that ICRR's failure to provide a safe working environment resulted in his injuries. Specifically, Wheeler alleges that on September 21, 2007, while attempting to throw the NOAR switch, the switch handle came to a sudden stop causing him to sustain a back

injury.  *See* Wheeler Dep. 80,  Def.'s Mot. Summ J., Ex. B. [Doc. # 76-2].  He claims that before he attempted to engage the switch he checked for obstructions and saw none.  When the switch came to a sudden stop, he again checked for possible obstructions, saw none, and after "bumping" it, he was able to continue on and completely open the switch.  *Id*. at 80-81.

Wheeler's expert, Raymond Duffany, is "a civil engineer and railway consulting expert" who "was retained to provide an opinion as to the design, maintenance and condition of the switch Plaintiff was operating at the time of his injury."  *See* Pl.'s Designation of Experts ¶ 4 [Doc. # 25].  Duffany has worked as a civil engineer in the railroad industry for 35 years.  Duffany inspected the site on November 19, 2009, two years after Wheeler's incident, and noticed a groove in the wooden switch tie along the path that the switch clip or cuff would follow when the switch is being thrown. The switch stand used by Wheeler had been replaced in August of 2009, before Duffany's inspection, with the same type of switch stand, a Racor 112-E, because a train ran through the switch at issue here.  The old switch was not preserved.  Based on his  inspection, his knowledge and expertise, and his review of the switch inspection records and the deposition testimonies of Wheeler and Larry Anderson, ICRR's Railroad Manager of Track Standards, Duffany concluded that:

1. A properly maintained switch should operate with relatively uniform movement and should not stop or hang up during the movement while an improperly maintained switch may act erratically, working normally at times but malfunctioning or becoming hard to throw at other times;
2. Wheeler used proper switch-throwing technique;
3. The switch was not properly maintained by ICRR;

4.   "The switch rod and clip that was making contact with the switch timber had not been changed or replaced and it was in the same relative position at the time of [his] inspection and the time of this incident" and that "the condition had existed for a long enough period of time to have been detected and corrected prior to this incident if proper inspections had been performed;" and finally,

5.   "The switch malfunctioned on the date of this incident because the number 2 switch rod was not properly positioned which allowed the switch clip to bind on the side of the switch timber."

Both parties admit that there is no definitive way of telling what caused the switch tie groove to form or when it formed. Switch components can shift over time due to normal railroad conditions such as exposure to weather, heavy equipment, and maintenance activities. Duffany concedes in his report that "[b]ecause of normal slight longitudinal movement of the switch points due to expansion and contraction which occurs with temperature change; and movement under train traffic, the operation of the switch may be erratic and operate normally at times and malfunction intermittently."

ICRR contends that Duffany's testimony is unreliable because his opinion that the switch tie and the clip were in contact at the time of the incident and caused the binding of the switch during Wheeler's throw is based solely on speculation and not reliable principles and methods. Wheeler argues that Duffany used deductive reasoning to provide "at least one cause for the switch to have operated improperly on the date in question," and that the accuracy or credibility of his conclusion is a matter for the jury. *See* Pl.'s Mem. Opp. ¶¶ 14, 17 [Doc. # 88].

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702, amended post-*Daubert* in 2000, provides that a witness "qualified as an expert … may testify … in the form of an opinion … if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). "*Daubert* . . . assigned the trial court a gatekeeper role to ensure such testimony is both reliable and relevant." *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

In evaluating the reliability of scientific and other expert testimony, district courts may consider several, non-exclusive, flexible *Daubert* factors, including:

(1) whether the expert's theory can be or has been tested;

(2) whether the theory has been subject to peer review and publication;

(3) the known or potential rate of error of a technique or theory when applied;

(4) the existence and maintenance of standards and controls; and

(5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc) (citing *Daubert* at 593-95). In *Kumho Tire Co.*, the Supreme Court noted that the *Daubert* analysis is "flexible," and that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his

testimony." 526 U.S. at 150. The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

"Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert conclusions themselves." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). "[T]he trial court's role . . . is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Nonetheless, "[t]he proponent of expert testimony . . . has the burden of showing that the testimony is reliable," *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004), and must establish the admissibility requirements "by a preponderance of the evidence." *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

### III. APPLICATION AND ANALYSIS

Given Duffany's vast experience as a civil engineer in the railroad industry, he is undoubtedly qualified to offer his opinions on track maintenance and design.  His testimony on these subjects will assist the trier of fact in understanding how the switch in question should optimally operate and whether the efforts taken by ICRR to maintain the switch in question were adequate.   Further, Duffany is qualified to give his opinion as to whether a lack of maintenance, if shown, could cause the switch to operate in an erratic function and bind mid-throw.

The reliability of Duffany's methods in reaching his conclusions as to the positioning of the switch clip and switch tie on the day of Wheeler's accident is a closer call.  The *Daubert* factors are relatively unhelpful in analyzing whether Duffany's methodology was reliable because he relies on his experience and expertise with switches and their maintenance (or lack thereof), Wheeler's testimony, a groove worn in the switch tie, and deductive reasoning.

ICRR specifically objects to Duffany's conclusion that the groove he saw on his inspection was present when or before the accident occurred.  Duffany's inspection was completed two years after the incident, and months after the switch stand was replaced.  Duffany admits that the groove in the switch tie could have been created by different means, and he cannot say with certainty how long the groove has been present.  In his opinion, Duffany believes that the groove is the result of contact between the switch plate and the tie and he explains how this can result over time as the track moves under normal circumstances.   He concludes that the groove was present the day the switch bound up on Wheeler based on "the lack of work, the description of how the switch operated by Mr. Wheeler, and my experience and that those things happen over a long period of time." Duffany Dep. at 67.  Although this may be shaky ground upon which to base a conclusion, the duty of the Court is to ascertain the reliability

6

of Duffany's method and not the credibility of his conclusion. Duffany may use his past experience to develop his conclusion so long as he uses the same level of intellectual rigor that one would expect from a civil engineer in the railroad industry. Whether his conclusion that the groove has been there over two years is credible is an issue for the jury. ICRR, of course, can vigorously contest his conclusions on cross-examination by asking about other possible reasons the switch would bind up and by emphasizing the uncertainty as to whether the groove was present before the incident occurred. Further, the Court will consider renewed contemporaneous challenges to Duffany's testimony and the switch tie groove evidence as to relevance and undue prejudice and the Court will make its evidentiary rulings with the added benefit of context.

## IV. CONCLUSION

For the reasons given above, the Court finds that the Raymond A. Duffany is qualified in the field to offer his opinions, and that the method used to reach his conclusions is reliable.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Defendant's motion to exclude testimony of Plaintiff's expert witness [Doc. #80] is **denied.**

SO ORDERED AND ADJUDGED on this, the 8th day of November, 2010.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE