**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**


**ANDREW WHEELER**                                                                 **PLAINTIFF**

**VERSUS**                                          **CIVIL ACTION NO. 2:09cv008KS-MTP**

**ILLINOIS CENTRAL RAILROAD COMPANY**                              **DEFENDANT**


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, Or, In the

Alternative, for Partial Summary Judgment [Doc. # 76] (August 13, 2010).  The Court, having

reviewed the motion, the responses, the pleadings, and exhibits on file and being otherwise fully

advised in the premises, finds that the summary judgment motion should be **denied**.  The Court

specifically finds as follows:


# I. FACTS

Andrew Wheeler alleges that he was injured while operating a main line railroad switch

at North Old Augusta Road Junction near Hattiesburg, Mississippi (the "NOAR switch"), and

seeks recovery against his prior employer, Illinois Central Railroad Company ("ICRR") under the

Federal Employers Liability Act ("FELA"). 45 U.S.C. §51 *et seq.*  He alleges that the NOAR

switch was defective and negligently maintained and inspected under the requirements set forth

in 49 C.F.R. § 213.235 and that ICRR's failure to provide a safe working environment resulted in

his injuries.  Wheeler also alleges that ICRR did not maintain appropriate inspection records as

required by 49 C.F.R. § 213.241.  Wheeler contends that the inadequate recordkeeping raises

1

questions about the actual frequency and/ or adequacy of the inspections, particularly those done on the NOAR switch.

ICRR, on the other hand, argues that Wheeler has not presented any evidence that either the switch was defective prior to Wheeler's alleged incident or, if it was defective, that ICRR had any notice of the defective condition before the accident.  Further, ICRR argues that Wheeler has not presented proof that the alleged defective condition caused his injuries.  Finally, ICRR argues that the negligent inspection and maintenance claims are precluded under the Federal Railroad Safety Act of 1970 ("FRSA") because ICRR complied with all regulations issued by the Federal Railroad Authority ("FRA") relating to inspecting and maintaining the subject switch.

Specifically, Wheeler alleges that on September 21, 2007, while attempting to throw the NOAR switch, the switch handle came to a sudden stop causing him to sustain a back injury. *See* Wheeler Dep 80,  Def.'s Mot. Summ J., Ex. B. [Doc. # 76-2].  He claims that before he attempted to engage the switch he checked for obstructions and saw none.  When the switch came to a sudden stop, he again checked for possible obstructions, saw none, and after "bumping" it, he was able to continue on and completely open the switch.  *Id*. at 80-81.  Wheeler claims that he radioed to the engineer, David Myers, and brakeman, Shelton Powe, that the switch hung up, and that he verbally told Jerry Sumrall, the track supervisor, of his problems with the switch upon his return to the yard.  *See id.* at 90, 93, 96-97.  However, Wheeler does not present any evidence that he reported the incident other than his own testimony.[1]  Wheeler allegedly made a notation on a Switch Position Awareness Form that he maintained personally

---

[1]The Court notes that hearsay evidence is inadmissible and insufficient evidence to survive summary judgment.  Hearsay evidence will only be admitted at trial if it falls within one of the hearsay exceptions.

but never turned into ICRR,   *Id.* at 93.  He also claims that when he saw a fellow conductor, Eric

Clark, a month after his incident, Clark told him that the NOAR switch was still hanging up.  *Id.*

at 118.  Clark denies ever seeing him or saying this.  *See* Clark Dep. at 12-13, Def.'s Mot. Summ.

J., Ex. D [Doc. # 76-4].

      Several others had operated the NOAR switch during that time period and had no

difficulties with the switch.  Clark stated that he had thrown the switch approximately twenty

times without problem and had never heard of a problem with it.  *See* Clark Dep. at 18-19, 23.

Jeramy Joinder, another conductor, never had a problem with the NOAR switch since 2006 and

was not aware of anyone else complaining about it.  *See* Joinder Dep. at 17, *Id.*, Ex. E [Doc. #

76-5].  Clarence Bufkin, a retired engineer, testified that he was not aware of any problem with

that particular switch over his thirty years of service with ICRR.  *See* Bufkin Dep. at 8, *Id.*, Ex. F

[Doc. # 76-6].  Wheeler himself had operated the switch before and after the incident without any

problems.  *See* Wheeler Dep. at 89, 97-98.  Wheeler did not recall anyone else ever reporting a

binding spot or any trouble with the NOAR switch to him, including the brakeman, Powe, who

threw the switch on the return trip later that day.  *Id.* at 89-90.  The inspection records show that

Charles O'Neal inspected the NOAR switch monthly in the three months preceding the incident,

as well as the day after the alleged incident.   In his deposition, O'Neal testified that "I did throw

it if I inspected it."  In other words, O'Neal claims that he operated the switch not quarterly, but

monthly, which is more often than the regulations require.  No defects were noted for the NOAR

switch during the inspections that occurred on June 26, July 25, August 21, or September 22,

2007.

      Wheeler notes some deficiencies in the documentation.  The Inspection Report lists each

"SWITCH NAME" and "MP LOCATION" for the Beaumont subdivision, the area in which the
NOAR switch is located.  The switch names and mileage markers are preprinted in the columns.
The remaining four columns are labeled  "DATE INSPECTED," "DEFECT (IF YES CHECK),"
"SWITCH THROWN Quarterly only (Y/N)," and "MAIN LINE SWITCH (Y/N)."  For the June
inspection, the columns for "date inspected" were filled in, but  "switch thrown" and "main line
switch" columns were left blank for all switches.  In July, O'Neal again noted the inspection
dates, but for this month, he indicated "YES" in the "switch thrown" column and "YES" in the
"main line switch" column for seven of the switches listed in the inspection report.  Notably,
O'Neal did not put "YES" in either of these columns for the NOAR switch.  In August, and again
in September, the inspection dates were listed but the "switch thrown" and "main line switch"
columns were left blank.  In these four reports, O'Neal noted defects and his remedial actions for
several switches, but did not note any defects for the NOAR switch.  *See* O'Neal Dep. at Ex. 1,
Pl.'s Resp., Ex. A, [Doc. # 87-1].

      Wheeler also notes that oiling the switches was not a part of ICRR's regular maintenance
plan despite the recommendation of the manufacturer.  Larry Anderson, ICRR's Railroad
Manager of Track Standards testified a sticker on the current switch stand recommended that it
be greased every four months to increase performance and lifespan, and acknowledged that a
switch will wear out more quickly if they are not greased.  *See* Anderson Dep. at 28, Def.'s Mot.
Summ. J., Ex. H [Doc. # 76-8].  Anderson testified that he did not know of any policy or
standard at ICRR for checking and greasing high switch stands.  *Id.* at 29.  However, Anderson
did testify that ICRR would "frequently lubricate our switch plates and that's where most of the
friction would come from."  *Id.* at 31.  He also testified that if an employee had complained that a

switch was hard to throw, the person sent to service the switch may apply lubricant if they felt it "was dry and there was friction." *Id.* at 55.

Finally, Wheeler's expert, Raymond Duffany, inspected the site two years after Wheeler's incident and noticed a groove in the wooden switch tie along the path that the switch clip or cuff would follow when the switch is being thrown. Both parties admit that there is no definitive way of telling what caused this groove to form or when the groove formed. However, Duffany concludes that the switch clip caught on the switch tie two years earlier during Wheeler's switch throw which caused the sudden stop. The Court denied ICRR's separate motion to exclude Duffany's expert opinion, finding that ICRR could challenge the bases of his conclusions through vigorous cross-examination.

## II. STANDARD OF REVIEW

Summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). To support a motion for summary judgment, "the moving party ... [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir. 2004). Material facts are those that "could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (internal citations omitted). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007). If the movant satisfies its initial burden, then the burden shifts back to the nonmoving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The nonmovant is not entitled to merely rest on his pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). If the nonmovant responds and still "no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

## III. APPLICATION

Under the Federal Employers' Liability Act:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. "What constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes." *Rogers v. Missouri Pac. Railroad Co.*, 352 U.S. 500, 507 n.13,

77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957) (citing *Urie v. Thompson*, 337 U.S. 163, 174, 69 S.Ct.

1018, 1027, 93 L.Ed. 1282 (1949)).  "Federal decisional law formulating and applying the

concept governs."  *Id.*

There are two common elements to prove liability under FELA, whether seeking to prove

the negligence of the railroad: "(1) negligence, i.e., the standard of care, and (2) causation, i.e.,

the relation of the negligence to the injury."  *Page v. St. Louis Southwestern Ry. Co.*, 349 F.2d

820, 823 (5th Cir. 1965).  "So far as negligence is concerned, that standard is the same- ordinary

prudence- for both Employee and Railroad alike." *Id; see also Gautreaux v. Scurlock Marine,

Inc.,* 107 F.3d 331, 335 (5th Cir. 1997) ("The duty of care owed, therefore, under normal rules of

statutory construction, retains the usual and familiar definition of ordinary prudence.").

"[N]egligence is the failure to observe that degree of care which people of ordinary prudence and

sagacity would use under the same or similar circumstances; and [ ] defendant's duty [is]

measured by what a reasonably prudent person would anticipate as resulting from a particular

condition-'defendant's duties are measured by what is reasonably foreseeable under like

circumstances'– by what 'in the light of the facts then known, should or could reasonably have

been anticipated.'"  *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 118, 83 S.Ct. 659, 9 L.Ed.2d

618 (1963) (finding it reasonably foreseeable that fetid, stagnant pool of water on railroad

property would attract insects such as the one that caused injury to railroad employee  while he

was  working in general vicinity).

A railroad's violation of a federal regulation implemented for employee safety is

negligence per se.  *See Roy Crook & Sons, Inc. v. Allen*, 778 F.2d 1037, 1039 (5th Cir. 1985)

("when an employee is injured as a result of the employer's violation of a statute, the employer

must pay damages even if the injury the employee suffered was not an injury that the statute was specifically aimed at protecting against") (citing *Kernan v. American Dredging Co.*, 355 U.S. 426, 432-33, 78 S.Ct. 394, 2 L.Ed.2d 382 (1957)); *see also  Belle v. New Orleans Public Belt*, 2010 WL 2010509 (E.D. La. May 17, 2010) (denying motion for new trial although jury was instructed that it must find railroad negligent if it finds railroad violated safety standards for radio communication during train movements in 49 C.F.R. § 220.49, but that it still must then determine causation).

Under Federal Railroad Safety Act ("FRSA"), 45 U.S.C. § 421, *et seq*. or 49 U.S.C. § 20101, *et seq*. the Federal Railway Administration, through the Secretary, has prescribed various regulations, such as 49 C.F.R. §§ 213.135(e) and 213.235 which provides standards for switches and their inspections, and § 213.241, which provides standards for maintenance records.  Section 213.135(e) structurally requires that "[e]ach switch stand and connecting rod shall be securely fastened and operable without excessive lost motion."  49 C.F.R. § 213.135(e).  As to switch inspections, the regulations state:

> (a) Except as provided in paragraph (c) of this section, each switch, turnout, track crossing, and moveable bridge lift rail assembly or other transition device shall be inspected on foot at least monthly.
>
> (b) Each switch in Classes 3 through 5 track that is held in position only by the operating mechanism and one connecting rod shall be operated to all of its positions during one inspection in every 3 month period.
>
> (c) In the case of track that is used less than once a month, each switch, turnout, track crossing, and moveable bridge lift rail assembly or other transition device shall be inspected on foot before it is used.

49 C.F.R. § 213.235.  As to recordkeeping, the regulations state:

(a) Each owner of track to which this part applies shall keep a record of each inspection required to be performed on that track under this subpart.

(b) Each record of an inspection under §§ 213.4, 213.119, 213.233, and 213.235 shall be prepared on the day the inspection is made and signed by the person making the inspection. Records shall specify the track inspected, date of inspection, location and nature of any deviation from the requirements of this part, and the remedial action taken by the person making the inspection. The owner shall designate the location(s) where each original record shall be maintained for at least one year after the inspection covered by the record. The owner shall also designate one location, within 100 miles of each state in which they conduct operations, where copies of records which apply to those operations are either maintained or can be viewed following 10 days notice by the Federal Railroad Administration.

49 C.F.R. § 213.241.

The Supreme Court has recently held that the standard for proving causation is the same for the employee and the railroad.  *See Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 169, 127 S.Ct. 799, 166 L.Ed. 2d 638 (2007) (affirmatively citing Fifth Circuit's "thoughtful treatment" in *Page* decision).  However, the *Sorrell* opinion did not resolve *what* was the standard for causation since that question was not raised when seeking certiorari and had not been fully presented.  *Id.* at 164-65.

 In an earlier Supreme Court opinion, the court held that the statutory language "in whole or in part" meant that "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *Rogers*, 352 U.S. at 506.  "The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference."  *Id.* at

508; *see also Davis v. Odeco, Inc*., 18 F.3d 1237, 1243 (5th Cir. 1994) ("the jury was entitled to infer causation from unexplained events").  Although some courts have struggled with whether or not the *Rogers* decision lessened the common law burden of proving proximate cause, the Fifth Circuit precedent clearly supports a lesser burden.  *See Sorrell,* 549 U.S. at 164 (citing State Supreme Court cases that still apply proximate cause standard after *Rogers*); *but see Rivera v. Union Pac. R. Co.*, 378 F.3d 502, 506, 509-10 (5th Cir. 2004) (noting FELA's reduced standard of causation, or "featherweight" burden to demonstrate connection between employer's negligence and the injury); *Gautreaux*, 107 F.3d at 335 (recognizing "reduced standard of causation between the employer's negligence and the employee's injury in FELA § 51 cases"); *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1042 (5th Cir. 1982) (describing lower causation std as "'producing cause' standard, which incorporates 'any cause regardless of immediacy"); *Johnson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 730 n.4 (E.D. La. 2009) (adhering to relaxed causation standard).  Three members of the Supreme Court questioned the "relaxed standard" in their concurrence to the *Sorrell* opinion, but neither a majority of the Supreme Court nor a panel of the Fifth Circuit has endorsed this argument.  *See Sorrell,* 549 U.S. at 172-177 (Souter, J.,concurring); *Johnson*, 599 F. Supp .2d at 730 n.4.

## A. NEGLIGENCE

Wheeler has presented evidence to show a genuine issue of material fact whether ICRR inspected the NOAR switch monthly and operated it quarterly as required by 49 C.F.R. § 213.235.  O'Neal, the track inspector, testified that he inspected the switch monthly, and that he

10

threw each switch as a part of that monthly inspection, exceeding the requirements of the federal regulation.  The inspection records for the three months prior and the month of the incident show the dates that the switches were inspected and are signed by O'Neal. Wheeler, on the other hand, relies on the discrepancies in the July 2007 inspection report to show a genuine issue whether the NOAR switch was actually being thrown quarterly.  A reasonable jury could conclude from the July inspection report that O'Neal's affirmative answers in the "switch thrown" column for other switches and the absence of any notation in the "switch thrown" column for NOAR switch means that the NOAR switch was not thrown that month.  The reports for June, August, and September all lack notation in the "switch thrown" column, and a reasonable jury could conclude that no answer meant that the operation was not completed.   While O'Neal has presented a reasonable argument for the lack of notation for the NOAR switch in the July inspection report– mere oversight– it is not the duty of the Court at this juncture to weigh the reasonableness of the evidence.  Therefore, Wheeler has presented sufficient evidence to create a jury issue whether or not ICRR breached its duty under the safety regulations put forth by the FRSA.

While the switch stand is not safety equipment, it is reasonable that FELA requires regular inspections of the switches in part to ensure the safety of its employees.  The switch stand is manually operated by its employees and ensuring the proper functioning of the switch could reasonably be seen as an effort to prevent the type of injury alleged by Wheeler.  Therefore, Wheeler has presented evidence sufficient to create a genuine issue as to whether the railroad was negligent per se.

Furthermore, Wheeler provides enough evidence from which a reasonable jury could conclude that ICRR did not use ordinary prudence to ensure that the switch stand and connecting

rod were operating without lost motion as required by 49 C.F.R. § 213.135(e).  As evidence of

the defective or insufficient condition of the switch at the time of Wheeler's alleged incident,

Wheeler first relies on his own experience with the switch binding up two-thirds of the way

through the throw.  In a factually similar case, the Second Circuit in an unpublished opinion

stated that the plaintiff's own testimony that he "found the switch difficult to throw does not

provide a reasonable basis for a jury to find that D&H breached its duty to provide him with a

safe workplace." *Haas v. Delaware & Hudson Railway Co.*, 282 Fed. Appx. 84, 88 (2d Cir.

2008).  The Court noted that FELA was not a strict liability statute, and that proof of injury alone

is not enough to establish liability.  *Id.* at 87.  The employer "is not obligated to provide a

workplace free of difficulty." *Id*. at 88.  The Court also concluded that the plaintiff in that case

failed to provide evidence that the employer had actual or constructive notice of the allegedly

defective condition." *Id.*; *see also Beeber v. Norfolk Southern Corp.*, 754 F. Supp. 1364, 1370

(N.D. Ind. 1990) (finding testimony that derail was hard to operate insufficient without proof that

employer knew or should have known of defect); *but see Tipton v. Norfolk Southern Ry. Co.*,

2010 WL 29227186 at *5 (N.D. Ohio 2010) (denying summary judgment because reasonable

jury could conclude that under-oiled derail device was defective and could have been detected by

railroad through reasonable inspection, especially given the weather conditions at the time).

     Here, Wheeler does not simply testify that the switch was hard to throw, but that it bound

up.  Duffany, is likely to testify that this abrupt stop as well as the groove in the tie are consistent

with his theory that the switch clip was catching on the switch tie.  Finally, Wheeler presents the

testimony of Anderson to show that the railroad was not following the manufacturer's

recommendations for oiling the switch stand.[2]  This may very well be related to a different theory

of how the switch stand bound up, but is enough evidence that the NOAR stand may have been

in a defective condition to survive summary judgment.  In sum, Wheeler has provided weak

evidence of a defect, but enough to survive summary judgment.

      Wheeler has presented enough evidence of ICRR's knowledge of the alleged defect to

survive summary judgment as well.  While Wheeler admits that he has no direct evidence that

ICRR actually knew of the defective switch, Wheeler alleges that the jury should be allowed to

infer that ICRR knew or reasonably should have known of the defect because they failed to

properly inspect as fully discussed above.  He also alleges that the deficiencies in the inspection

records– O'Neal's failure to indicate "YES" in the switch thrown columns– gave ICRR

constructive knowledge  that the required inspections were not happening. Specifically, Wheeler

further questions why someone reviewing the records, presumably the track supervisor, Sumrall,

would not notice that according to the reports a main line switch, specifically the subject switch,

had not been thrown in a four month period despite federal regulations requiring that the switch

be thrown quarterly.  If the jury concludes that a defect existed at the time of the incident,

Wheeler has presented enough proof for a reasonable jury to conclude that ICRR should have

detected it.  In sum, though weak, this evidence in total is enough to create a jury issue as to

whether ICRR maintained the switch stand to operate free from lost motion as required by the

federal regulations.

_____

     [2]ICRR argues that FELA preempts any duty to follow manufacturer's recommendations.
However, FELA requires that the switch be operable without lost motion, and does not specify
exactly how that is to be accomplished.  The recommendations, then, inform the jury what an
ordinarily prudent railroad would do to comply with the broad mandate in the regulations.

## B. CAUSATION

Assuming that the jury finds that ICRR breached a safety regulation, Wheeler must still provide some evidence that the failure to inspect caused his injury.  As noted above, the jury must find only that the railroad's negligence "played any part, even the slightest, in producing the injury."  The Fifth Circuit has characterized this as a "featherweight burden."  To show that the failure to inspect caused the injury, one would have to find that there was a defect that would have been discovered had a proper inspection taken place.  Although Wheeler's evidence of a defect is weak, as noted above, he has presented enough evidence to survive summary judgment. As noted, the causation standard is featherweight and if the jury finds the evidence of a defect persuasive, they could reasonably conclude that the defect caused the injury.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment [Doc. # 76] filed on behalf of Defendant, is hereby **denied**.

SO ORDERED AND ADJUDGED this the 9th day of November, 2010.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE